# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SULLIVAN COUNTY FABRICATION, INC, on behalf of itself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>SELECTIVE INSURANCE COMPANY OF AMERICA and SELECTIVE WAY INSURANCE COMPANY,<br><br><br>Defendants. | Case No.:<br><br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Sullivan County Fabrication, Inc. ("SCF" or "Plaintiff"), by way of Complaint against Defendants Selective Insurance Company of America and Selective Way Insurance Company ("Selective" or the "Defendants") alleges as follows:

## I.      INTRODUCTION

1.      In December 2019, the infectious Coronavirus ("COVID-19") disease emerged in Wuhan, China, rapidly spreading to Europe and the United States, reaching New York State by March 2020.[1]

---

[1] *See* Melanie Grayce West, *First Case of Coronavirus Confirmed in New York State*, The Wall Street Journal (March 1, 2020) https://www.wsj.com/articles/first-case-of-coronavirus-confirmed-in-new-york-state-11583111692.

2.      On January 30, 2020 the World Health Organization (the "WHO") declared a public health emergency of international concern.  Six weeks later, on March 11, 2020, the WHO assessed COVID-19 as a global pandemic.[2]

3.      On March 16, 2020, the White House, the Center for Disease Control and Prevention (the "CDC"), and members of the US national Coronavirus Task Force issued guidance to the American public, titled "30 Days to Slow the Spread" for stopping the spread of COVID-19 in the United States.[3]  This guidance advised individuals to adopt extensive social distancing measures, including working from home for all non-essential businesses, avoiding discretionary travel and gatherings of more than 10 people, and staying away from public venues.[4]

4.      The result of these government-mandated restrictions and prohibitions has threatened the survival of many businesses, especially small and medium enterprises which have been forced to shut down operations, lose cash flow, and furlough employees -- while continuing to pay for substantial existing obligations and overhead.

5.      Most businesses insure against unforeseen catastrophic events like the ongoing COVID-19 pandemic and the subsequent government-mandated closures through general commercial property insurance policies.  These contractual policies promise to indemnify policyholders for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed.  This coverage is commonly known as business interruption

---

[2] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19* (March 11, 2020) https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.
[3] *See* The Whitehouse, Coronavirus Guidelines for America, *30 Days To Slow The Spread* (March 16, 2020) https://www.whitehouse.gov/briefings-statements/coronavirus-guidelines-america/.
[4] *See id.*

or "loss of income" coverage and is standard in most general commercial property insurance policies.[5]

6.      The State of New York requires that insurance companies operating there must conduct fair, balanced and thorough investigations of all bases of claims for benefits made by insured entities.  As part of their obligations, insurance companies are required to search for and consider evidence that supports coverage of the claimed loss, and in doing so must "resolve any ambiguities in the policyholders' favor promptly and diligently."[6]

7.      Plaintiff purchased Commercial General Liability and Property Coverage from Defendants on December 24, 2019, for a period effective December 20, 2019 through December 20, 2020.  Defendants have reneged on their obligations and refused to insure business income losses and other covered expenses incurred by Plaintiff caused by the government-mandated COVID-19 pandemic closure.

8.      Consistent with New York insurance claims handling standards, Plaintiff had the right to rely on Defendants to handle its insurance claim for business interruption losses in a manner consistent with the standards of good faith and fair dealing.  Unfortunately for Plaintiff, Defendants denied the claim in its entirety.

9.      This action seeks a declaratory judgment that affirms that the COVID-19 pandemic and the corresponding response by civil authorities to stop its spread triggers coverage, has caused physical property loss and damage to the insured property, provides coverage for future civil

---

[5] *See* Kimberly Lankford, *What Is Business Interruption Insurance?*, U.S. News & World Report (April 8, 2020) https://money.usnews.com/money/personal-finance/saving-and-budgeting/articles/what-is-business-interruption-insurance.
[6] *See* New York Department of Financial Services, *Insurance Circular Letter No. 11 (2019)* (September 12, 2019) https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2019_11.

authority orders that curtail policyholders' business operations, and finds that Defendants are liable for the corresponding business losses suffered by policyholders.

10.     This action brings a claim against Defendants for the breach of their contractual obligations under common general commercial property insurance policies to indemnify Plaintiff and others similarly situated for business losses and extra expenses, and related losses resulting from actions taken by civil authorities to stop the human to human and surface to human spread of the COVID-19 pandemic.

11.     Plaintiff brings this action on behalf of a proposed class of Defendants' insurance policyholders who paid insurance premiums in exchange for commercial insurance policies that included lost business income and extra expense coverage.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a different State than that of Defendants.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because it is where a substantial part of the events or omissions giving rise to the claim occurred and where the insured business that is the subject of the action is situated.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendants do business in this District and thus reside in this District pursuant to 28 U.S.C. § 1391(c).

## III.     PARTIES

14. Plaintiff Sullivan County Fabrication, Inc. is incorporated in Sullivan County, New York and operates steel shelving manufacturing and refabricating facilities in New York State, including its insured premises located in Woodridge, New York.

15. As a manufacturer, SCF's business depends on, among other things, its premises being open, its staff being able to travel to its premises, and its ability to deliver products from its facilities.

16. Defendant Selective Insurance Company of America is an insurance company headquartered in Branchville, New Jersey. Selective Insurance Company of America is a subsidiary of a Selective Insurance Group, Inc. incorporated in Branchville, New Jersey.

17. Defendant Selective Way Insurance Company is an insurance company headquartered in New Jersey and is also a subsidiary of Selective Insurance Group, Inc.

18. Defendants issued Policy S 2396099 (the "Policy") to Plaintiff on December 24, 2019 and are named throughout the Policy and in Defendants' Denial Letter dated June 9, 2020. Plaintiff has paid all Policy premiums charged by Defendants under the insurance agreement to ensure coverage for lost business income and surplus expenses caused by involuntary business interruptions.

## IV.    FACTUAL BACKGROUND

### A. The COVID-19 Pandemic Causes Business Closures

19. Viruses in the Coronavirus family, including the Middle East respiratory syndrome (MERS) coronavirus (MERS-CoV) and severe acute respiratory syndrome (SARS) coronavirus (SARS-CoV), have infected humans and caused the loss of life since as early as 2002.

20.    In December 2019, an initial cluster of patients with an unknown viral pneumonia was found to be linked to the Huanan Market in Wuhan, China.[7]

21.    By January 2020, viral testing had allowed scientists to identify SARS-CoV-2, an RNA virus with a crown-like appearance.  Named after its crown-like structural proteins, the virus envelope has a crucial role in virus pathogenicity as it promotes rapid viral assembly and release.[8]

22.    The first confirmed case of the virus outside China was diagnosed on January 13, 2020 in Bangkok, Thailand with the number of cases increasing rapidly worldwide.  On January 30, 2020, the World Health Organization (WHO) declared the SARS-CoV-2 outbreak constituted a public health emergency of international concern, and by February 11, 2020, the virus was named "COVID-19" by the WHO Director-General.  As of July 15, 2020, the WHO reports over 13.1 million confirmed cases of COVID-19 globally and over 574,000 deaths, with the United States having suffered more than 3.3 million confirmed cases and approximately 135,000 deaths -- higher than any other country.[9]

23.    COVID-19 symptoms vary from severe and fatal cases of respiratory failure requiring ventilation and intensive care support, to mild and asymptomatic effects requiring no further medical attention.  Severe cases of COVID-19 include pneumonia, fever, cough, and dyspnea.  There are currently no certain treatments for COVID-19, and while vaccine development remains in progress, it is uncertain when treatment will be proven, tested, and available to the public.

---

[7] *See*  World Health Organization, *Pneumonia of unknown cause – China* (January 5, 2020) https://www.who.int/csr/don/05-january-2020-pneumonia-of-unkown-cause-china/en/.

[8] *See* Cascella M, Rajnik M, Cuomo A, et al. *Features, Evaluation and Treatment Coronavirus (COVID-19)* (April 6, 2020) https://www.ncbi.nlm.nih.gov/books/NBK554776/.

[9] *See* World Health Organization, *Coronavirus disease (COVID-19) Situation Report – 177* (July 15, 2020) https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200715-covid-19-sitrep-177.pdf?sfvrsn=b1a193f3_2.

24.     COVID-19 has several modes of transmission.  Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.  Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual.  Studies reveal that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.

25.      The incubation period for COVID-19, i.e. the time between infection and the manifestation of symptoms, averages 5-6 days.  However, it can be up to 14 days.  During this period, also known as the "presymptomatic" period, infected persons can be contagious.  For that reason, transmission from a pre-symptomatic case can occur before symptom onset.  Presymptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.  Asymptomatic persons can still transmit the virus to others.

26.     Besides human-to-human contamination, the WHO and medical experts have determined that the virus can survive on contaminated objects and surfaces -- for up to nine days according to one study.  As a result, all physical premises can be affected by secondary COVID-19 contagion, even when infected persons are not physically present.  This directly impacts the physical premises of virtually all businesses.

27.     COVID-19 can survive long periods of time outside the body, and COVID-19 is particularly contagious in indoor environments through its rapid airborne transmission and the constant recirculation of air in buildings.  According to epidemiologists, airborne transmission is

an acute concern because infectious droplets which remain suspended in the air for long periods of time can accumulate.[10]

28.    In the absence of a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human to human and surface to human exposure. The CDC's website advises that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.

29.    As a result of the primary and secondary exposure risks to COVID-19, the CDC recommends that in viral outbreaks individuals who are infected stay at home and those who are not sick engage in preventive measures such as consistent hand washing and avoiding activities that would bring them into close proximity of people with the virus or surfaces where the virus may reside.  Because these recommendations have been unable to neutralize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing all non-essential business establishments, including restaurants, bars, hotels, theaters, personal care salons, gyms, schools, and other non-essential commercial businesses such as Plaintiff's.[11]

30.    Government-mandated closures anticipating the virus' spread have severely curtailed or effectively shut down many sectors of the United States economy.[12]  Thus, many

_____

[10] *See* Fox2 Detroit, *Air conditioners could be aiding the spread of COVID-19 indoors, epidemiologists say* (July 17, 2020) https://www.fox2detroit.com/news/air-conditioners-could-be-aiding-the-spread-of-covid-19-indoors-epidemiologists-say.

[11]*See, e.g.*, Dutchess County, *Sullivan County Declares State of Emergency* (March 13, 2020) https://sullivanny.us/news/sullivan-county-declares-state-emergency; *see also* County of Sullivan County Manager's Office, *COVID-19 Reopening Plan* (June 3, 2020) https://sullivanny.us/sites/default/files/departments/PHS/Coronavirus/COVID-19%20Reopening%20Plan.pdf.

[12] *See* Business Insider, *More than half of the US population is now under orders to stay home — here's a list of coronavirus lockdowns in US states and cities* (April 1, 2020) https://www.businessinsider.com/states-cities-shutting-down-bars-restaurants-concerts-curfew-2020-3.

businesses have been adversely impacted by civil authorities' lockdown orders without having been impacted by the virus itself.

31.     As of July 16, 2020, virtually all states had implemented at least a partial closing over the course of the COVID-19 pandemic.[13]  Many states had launched partial re-openings after previously implementing more complete shutdowns by this time, however many states had also revised their reopening plans in response to renewed COVID-19 outbreaks.

32.     In New York State, all non-essential businesses were ordered closed under Governor Cuomo's 'New York State on PAUSE' executive order issued on March 20, 2020.  The Order's purpose was to prevent COVID-19's spread and to mitigate the imminent and substantial endangerment to people and property stemming from the pandemic.  Some of the order's effects were limited or extended by subsequent orders.[14]

### B.  Plaintiff's Insurance Policy

33.     Plaintiff's Policy is attached hereto as Exhibit A for the Court's convenience.[15]

---

[13] *See* The New York Times, *See Which States Are Reopening and Which Are Still Shut Down* (last visited May 14, 2020) https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html.

[14] *See* New York State, *Governor Cuomo Signs the 'New York State on PAUSE' Executive Order* (March 20, 2020) https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order; *see also* New York State, *Amid Ongoing COVID-19 Pandemic, Governor Cuomo Announces 'NYS on PAUSE' Extended until May 15* (April 20, 2020) https://www.governor.ny.gov/news/amid-ongoing-covid-19-pandemic-governor-cuomo-announces-nys-pause-extended-until-may-15; *see also* New York State, *No. 202.31: Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency* (May 14, 2020) https://www.governor.ny.gov/news/no-20231-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency; *see also* New York State, *No. 205: No. 205: Quarantine Restrictions on Travelers Arriving in New York* (June 24, 2020).

[15] For the Court's convenience, the Policy is 303 pages in total and Policy page references are included in the citations below.

34.     Plaintiff's Policy includes a Commercial General Liability Coverage policy, Form CG 01 63 0 7 11, which covers losses, including "property damage" to Plaintiff's covered premises.  Exhibit A at 181.

35.     The Policy includes Building and Personal Property Coverage, Form CP 00 1 0 10 12, where Defendants promise that they "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  Exhibit A at 73.

36.     Plaintiff's Policy includes a general aggregate limit of $2,000,000, a completed products limit of $2,000,000, and a damage to premises limit of $500,000. *See* Exhibit A at 172, Commercial Liability Coverage Declaration.  Plaintiff's Policy also includes a "Business Income" (business interruption) coverage limit of $500,000.  Exhibit A at 63.

37.     Plaintiff's Policy, as well as the policies of other Class Members, are Defendants' standard commercial insurance forms.  Plaintiff currently has valid commercial insurance coverage under the Policy through December 20, 2020.

**C.  Plaintiff's Factual Allegations**

38.     Plaintiff's Policy includes Business Income and Extra Expense Coverage, which require Defendants to indemnify Plaintiff for its lost income and profits under circumstances where SCF's business is forced to suspend operations.

39.     The Policy's "Business Income (and Extra Expense) Coverage Form" is described in Form CP 0 30 10 12, which includes an obligation by Defendants to pay Plaintiff's lost income:

> We will pay for the actual loss of Busines Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations.  The loss or damage must be caused by or result from a Covered Cause of Loss.

Exhibit A at 89.

40.    The Business Income (and Extra Expense) Coverage Form also includes Extended

Business Income provisions:

> We will pay Extra Expense to (1) avoid or minimize the suspension of business and
> to continue operations at the described premises. . .(2) minimize the suspension of
> business if you cannot continue operations.

Exhibit A at 89.

41.    The Policy's ElitePac Property Extension Endorsement, Form CP 76 30 01 16,

extends coverage for loss of Business Income relying on dependent business:

> **Dependent Properties**
> We will pay for the loss of Business Income you sustain due to the necessary
> "suspension" of your "operations" during the "period of restoration." The
> "suspension" must be caused by direct physical loss or damage to "dependent
> property" caused by or resulting from a Covered Cause of Loss.

Exhibit A at 135.

42.    Under the Policy, insurance is extended to apply to the actual loss of business

income sustained and the actual, necessary and reasonable extra expenses incurred when access to

SCF's Insured Property is prohibited by order of civil authority as the direct result of a covered

cause of loss to property in the immediate area of Plaintiff's Insured Property.  According to the

Policy's Civil Authority coverage form:

> When a Covered Cause of Loss causes damage to property other than property at
> the described premises, we will pay for the actual loss of Business Income you
> sustain and necessary Extra Expense caused by action of civil authority that
> prohibits access to the described premises, provided that both of the following
> apply:
>
>> (1) access to the area immediately surrounding the damaged property is
>> prohibited by civil authority as a result of the damage, and the described
>> premises are within that area but are not more than 1 mile from the damaged
>> property; and

> (2) the action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Exhibit A at 90, Form CP 00 30 10 12.

43. The Policy is broad-based, and as was reasonably understood by Plaintiff, the Covered Causes of Loss include *all* risks of direct physical loss, including those resulting from civil authority action.

44. The Policy includes a Virus Exclusion, Form CP 01 78 08 08 which entails that:

> We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

Exhibit A at 106.

45. Plaintiff and all similarly situated Class members have suffered direct physical loss, loss of business, and damage to its property because, as a result of civil authority action, they have been unable to use its properties for their intended purposes.

46. The Virus Exclusion is not applicable because Plaintiff's and other class members' losses were not caused by a "virus, bacterium, or other microorganism", and there is no indication that the COVID-19 virus impacted Plaintiff's premises or caused it to incur any virus-related expenses. Instead, Plaintiff's and Class Members' losses were solely the result of precautionary measures taken by Plaintiff at the behest of New York State and the federal government to prevent the prospective spread of COVID-19.

47. Currently, Plaintiff is being denied coverage under the Policy despite having contracted with and reasonably relied upon Defendants' Policy provisions.

48. Plaintiff incurred physical losses, was forced to shut down on March 16, 2020, and requested that Defendants cover the business losses he incurred because of the civil authority COVID-19 shutdown on May 22, 2020. Reasonably expecting that its insurance Policy would be

honored, Plaintiff submitted its claim, requesting that Defendants honor their commitment to provide insurance coverage for business income and civil authority shutdown losses.

49.     On June 9, 2020, Defendants responded with a letter denying Plaintiff's claim for business income and extra expense coverage.  Defendants' Denial Letter is attached hereto as Exhibit B.

50.     In their Denial, Defendants claimed that there was no physical loss or damage to property -- thus precluding civil authority coverage -- and that the virus exclusion precluded a claim (and the Government-mandated shutdown was merely a cause of the virus): "This exclusion applies regardless of whether any other cause or event contributes to the loss.  The Corona-virus is the source of the COVID-19 Outbreak and the cause of the Governor of New York's directive to close non-essential businesses."  Exhibit B.

51.     Defendants' primary argument is hollow because Plaintiff has suffered both physical losses and other damages as a result of the civil mandated closure of SCF's premises.

52.     As drafters of the Policy, if Defendants had wished to exclude "physical loss *or* damage" resulting from government mandated precautionary measures, it could have used explicit language stating such a definition of "physical loss or damage" --  Defendants, however, did not. Under the most reasonable interpretation of the policy, Plaintiff has suffered both physical losses and other damages as a result of the State of New York's COVID-19 pandemic orders closing SCF's premises.

53.     Furthermore, based on the Policy language, the Virus Exclusion should not prevent Plaintiff's business income claims because Plaintiff's, and other class members', losses were not caused by a "virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress".  Rather, the actual and

proximate causes of Plaintiff's and other Class Members' losses were the precautionary measures taken by the State of New York, other states, and the federal government to prevent the prospective spread of COVID-19, not because coronavirus was found in or on Plaintiff's insured property. Thus, Plaintiff's business losses are within the scope of the commercial insurance Policy it contracted for and the virus exclusion does not apply.

54.     None of Defendants' stated reasons for denying civil authority coverage apply: contrary to Defendants' claims, Plaintiff was prohibited from accessing the premises by government action, the closure was caused by direct physical loss of or damage to other properties, and the closure was caused by a covered cause or loss because Defendants' virus exclusion does not apply to Plaintiff's premises, as discussed above.

**D. The COVID-19 Pandemic has Affected Defendants' Insurance Policyholders Nationwide.**

55.     Fallout from the COVID-19 pandemic is physically impacting private commercial property in New York and throughout the United States and threatening the survival of thousands of commercial businesses that have had its business operations suspended or curtailed by order of civil authorities.

56.     The overwhelming majority of states have implemented "stay-at-home" orders, and although some are currently rolling back restrictions, it remains in effect in New York and has had a devastating impact curtailing Plaintiff's regular business for the past several months and is likely to continue to do so.

57.     Defendants seeks to avoid covering commercial losses caused by civil authorities' response to the COVID-19 pandemic.

58.    For example, in response to Congressional inquiry, insurance industry trade groups have stated: "Business interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19."[16]

59.    Other state governments have adopted a different approach, anticipating that insurance companies will breach their obligations to provide coverage for business losses due to the COVID-19 pandemic closures.  These states have introduced bills requiring every insurance policy insuring against loss or damage to property, which includes the loss of use and occupancy and business interruption, be construed to include, among other covered perils, coverage for business interruption because of global virus transmission or pandemic.

60.    The State of New York supports COVID-19 business interruption coverage based on the relevant policy not having a pandemic exception and the claim being related to actual property damage.[17]

61.    Moreover, a New York State Assembly held on March 27, 2020 requires that "certain perils be covered under business interruption insurance during the coronavirus disease 2019 (COVID-19) pandemic" and stated that:

> Notwithstanding any provisions of law, rule or regulation to the contrary, every policy of insurance insuring against loss or  damage to  property, which includes, but is not limited to, the loss of use and occupancy and business interruption, shall be construed to include among the covered perils under that policy, coverage for business interruption during a period of a declared state emergency  due  to  the coronavirus disease 2019 (COVID-19) pandemic.[18]

---

[16] Insurance Journal, *Insurers Reject House Members' Request to Cover Uninsured COVID Business Losses* (March 20, 2020)
https://www.insurancejournal.com/news/national/2020/03/20/561810.htm.
[17] New York State Department of Financial Services, Coronavirus: Business Interruption Insurance (last visited May 14, 2020)
https://www.dfs.ny.gov/consumers/coronavirus/business_interruption_insurance_faqs.
[18] *see* Sate of New York (Assembly 10226) (March 27, 2020)
https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A10226&term=2019&Summary=Y&Text=Y.

62.     A declaratory judgment determining that the business income loss and extra expense coverage provided in common all-risk commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent the Plaintiff and similarly situated Class members from being denied critical coverage for which they have paid.

## V.      CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other persons similarly situated.

64.     The Nationwide Class is defined as:

> All Person or Businesses who have entered into standard all-risk commercial property insurance policies with Selective, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics.

The New York Sub-Class is defined as:

> All New York Citizens or Businesses who have entered into standard all-risk commercial property insurance policies with Selective, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics.

Excluded from each class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

65.     Plaintiff reserves its right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

66.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**A.  Numerosity**

67.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(1).  The Class numbers at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses.  Defendants sell many insurance policies in the State of New York and most, if not all, other states and therefore joinder of the Class members is impracticable.

68.     The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Defendants' or their agents' books and records.  Plaintiff anticipates providing appropriate notice to the certified Class in compliance with Fed.R.Civ.P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**B.  Typicality**

69.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and its claims arise from the same all-risk commercial property insurance policy provisions entered into with Defendants.  Each Class member's insurance policy contains the same form providing coverage for business income loss.  None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic. As a result, a declaratory judgment as to the rights and obligations under Plaintiff's Policy will address the rights and obligations of all Class members.

### C.  Adequacy of Representation

70.    Plaintiff is committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies.  Plaintiff has no interests antagonistic to or in conflict with other members of the Class.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

### D.  Commonality

71.    This action satisfies the requirements of Fed.R.Civ.P. 23(a)(2) because there are questions of law and fact that are common to each of the classes.  These common questions predominate over any questions affecting only individual Class members.  The questions of law and fact common to the Class include, but are not limited to:

> a.    Whether there is an actual controversy between Plaintiff and Selective as to the rights, duties, responsibilities and obligations of the parties under the business interruption coverage provisions in standard all- risk commercial property insurance policies;

> b.    Whether state and federally mandated measures to reduce the spread of the COVID-19 pandemic are excluded from Plaintiff's and the Class members' standard all-risk commercial property insurance policies;

> c.    Whether measures implemented by civil authorities to stop the spread of COVID-19 caused business interruptions including physical loss and damage to covered commercial property;

> d.    Whether Selective repudiated and breached the all-risk commercial property insurance policies issued with business interruption coverage by seeking to deny claims for coverage; and

> e.    Whether Plaintiff and Class members suffered damages as a result of the anticipatory breach by Selective.

### E.  Superiority/Predominance

72.    This action satisfies the requirements of Fed.R.Civ.P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members.  The joinder of individual Class members is impracticable because of the vast number of Class members who have entered into the standard all-risk commercial property insurance policies with the Defendants across multiple states.

73.    Because a declaratory judgment as to the rights and obligations under the uniform all-risk commercial property insurance policies will apply to all Class members, most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions.  The burden imposed on the judicial system by individual litigation, and to Defendants, by even a small fraction of the Class members, would be enormous.

74.    The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation.  Class adjudication is superior to other alternatives under Fed.R.Civ.P. 23(b)(3)(D).  Class treatment will also mitigate the risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

75.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common

questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

## **FIRST CAUSE OF ACTION**

### **(Breach of Contract)**

76.     Plaintiff incorporates by reference all paragraphs above as if set forth in full in this cause of action.

77.     Plaintiff entered into a contract, the Policy, with Defendants.  Defendants owed duties and obligations to SCF under the Policy.

78.     Plaintiff performed all that the Policy required it to do, including the consistent payment of premiums specified by Defendants.

79.     In the business interruption coverage, Defendants agreed to pay for their insureds' actual loss of Business Income sustained due to the necessary suspension of SCF's operations during the "period of restoration."

80.     Defendants also agreed to pay for their insureds' actual loss of Business Income sustained due to the interruption of their operations during the disruption period caused by direct physical loss or damage.

81.     Defendants' Policy language defines "Business Income" as Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred.

82.     The Closure Orders caused direct physical loss and damage to Plaintiff's and the other Class Members' Covered Properties, requiring suspension of operations at the Covered Properties.  Losses caused by the Closure Orders thus triggered the Business Income provision of Plaintiff's and the other Class Members' Selective policies.

83.    Defendants' denial of Plaintiff's claim is not in accordance with the terms of the Policy and New York law.

84.    Defendants have breached their contractual duties of good faith and fair dealing owed to Plaintiff in the following respects:

a.    Unreasonably acting or failing to act in a manner that deprives SCF of the benefits of the Policy;

b.    Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives their insureds of the benefits of policies it issues;

c.    Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of SCF's claim;

d.    Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under policies it issues;

e.    Unreasonably failing to diligently search for and consider evidence that supports coverage of SCF's claim;

f.    Unreasonably engaging in a pattern and practice of failing of failing to diligently search for and consider evidence that supports coverage of claims;

g.    Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of SCF's business interruption and closure losses;

h.    Unreasonably of failing to conduct an investigation to determine the actual and proximate causes on claims made by the insureds;

     i.     Unreasonably failing to consider Plaintiff and other Class Members' interests;

     j.     Unreasonably failing to apply the Policy's definitions and terms to determine whether SCF's claim was covered; and

     k.     Unreasonably compelling SCF to institute this action to obtain benefits due under the Policy.

85.     Plaintiff is informed and believes, and thereon alleges, that the foregoing unreasonable, malicious, oppressive and/or fraudulent misconduct was not limited to Defendants' evaluation of this particular claim, but represents an ongoing pattern and practice, which it applies to all of their policyholders, that is specifically designed by Defendants to earn illicit profits at the expense of their policyholders' rights. This ongoing pattern of conduct constitutes institutional bad faith.

86.     Defendants' institutional bad faith constitutes reprehensible conduct because it is part of a consistent pattern of unfair practices and not an isolated occurrence. The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in Defendants' policies and practices, specifically as in response to the COVID-19 pandemic. Plaintiff is informed and believes and thereon alleges that Defendants have engaged in similar wrongful conduct as to other insureds and that it has substantially increased their profits as a result of causing similar harm to others.

87.     As a direct and proximate result of Defendants' conduct and breach of their contractual obligations, Plaintiff has suffered damages under the Policy in an amount to be determined according to proof at the time of trial, and other foreseeable and consequential damages according to proof and in amounts to be determined at the time of trial.

88.    As a further proximate result of Defendants' unreasonable conduct, Plaintiff was compelled to retain legal counsel to obtain the benefits due under the Policy.    Therefore, Defendants are liable to Plaintiff for the attorneys' fees reasonably necessary and incurred by Plaintiff in order to obtain the Policy benefits.

89.    Defendants' conduct was intended to cause injury to Plaintiff; and/or was conduct carried on by Defendants with a willful and conscious disregard of Plaintiff's rights, subjected Plaintiff to unjust hardship in conscious disregard of its rights; and/or constituted an intentional misrepresentation or concealment of a material fact known to Defendants with the intention to deprive Plaintiff of property or legal rights or to otherwise cause injury.    Plaintiff is therefore entitled to an award of punitive damages in an amount appropriate to punish and set an example for other similarly situated insurers.

90.    Defendants' conduct was undertaken by their corporate officers, directors or managing agents who were responsible for claims supervision and operations, underwriting, communications, and/or decisions; and/or this conduct was authorized by one or more of Defendants' officers, directors or managing agents; and/or one or more of Defendants' officers, directors or managing agents knew of the actions and adopted or approved that conduct after it occurred. This conduct was, therefore, undertaken on behalf of Defendants.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment – Business Income Coverage)

91.    Plaintiff repeats the allegations set forth in paragraphs 1-89 as if fully set forth herein.

92.     Plaintiff's Selective Policy, as well as those of the other Class Members, are contracts under which Defendants were paid premiums in exchange for their promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policy.

93.     Plaintiff and other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have abrogated their insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide the coverage to which Plaintiff and Class Members are entitled.

94.     Defendants have denied claims related to COVID-19 on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

95.     An actual case or controversy exists regarding Plaintiff's and the other Class Members' rights and Defendants' obligations under the Policies to reimburse Plaintiff's and Class Members for the full amount of Business Income losses incurred by Plaintiff's and the other Class Members in connection with the suspension of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

96.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Class Members seek a declaratory judgment from this Court declaring the following:

a.     Plaintiff's and the other Class Members' Business Income losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

    b.    Defendants are obligated to pay Plaintiff and other Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Order during the period of restoration and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

## THIRD CAUSE OF ACTION

### (Declaratory Judgment – Civil Authority Coverage)

97.    Plaintiff repeats the allegations set forth in paragraphs 1-95 as if fully set forth herein.

98.    Plaintiff brings this Count individually and on behalf of the other Class Members.

99.    Plaintiff's Selective Policy, as well as those of the other Class Members, are contracts under which Defendants were paid premiums in exchange for their promise to pay Plaintiff's and other Class members' losses for claims covered by the Policy.

100.    Plaintiff and Class Members have complied with all applicable provisions of their policies, and yet Defendants have abrogated their insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class Members are entitled.

101.    Defendants have denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

102.    An actual case or controversy exists regarding Plaintiff's and other Class Members' rights and Defendants' obligations under the Policies to reimburse Plaintiff and other Class

Members for the full amount of covered Civil Authority losses incurred by Plaintiff and other Class Members in connection with Closure Orders and the interruption of their businesses.

103.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Class Members seek a declaratory judgment from this Court declaring the following:

        a.    Plaintiff's and other Class Members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

        b.    Selective is obligated to pay Plaintiff and other Class members the full amount of the state and federal Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals, demands judgment against the Defendants as follows:

1) Declaring this action to be a proper class action maintainable pursuant to Federal Rule of Civil Procedure 23(a) and Rule 23(b)(3) and declaring Plaintiff and its counsel to be representatives of the Class;

2) Issuing a Declaratory Judgment declaring the Parties' rights and obligations under the insurance policies;

3) Awarding Plaintiff and the Class compensatory damages from Defendants' breach of the insurance policies in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

4) Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff and the Class's counsel and experts, and reimbursement of expenses; and

5) Punitive damages in accordance with proof and in an amount consistent with applicable precedent;

6) Awarding such other and further relief the Court deems just, proper, and equitable.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all claims so triable.

Dated: July 24, 2020

By: */s/ Todd S. Garber*

Todd S. Garber (NY Bar No. 4129300)

**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
Todd S. Garber
D. Greg Blankinship
Sami Ahmad
1 N Broadway Suite 900
White Plains, NY 10601
(914) 298-3290
tgarber@fbfglaw.com
gblankinship@fbfglaw.com
sahmad@fbfglaw.com

**KANNER & WHITELEY, L.L.C.**
Allan Kanner
701 Camp Street
New Orleans, LA 70130
(504) 524-5777
A.Kanner@kanner-law.com

**GERSOWITZ LIBO & KOREK PC**
Jeff Korek
111 Broadway, Suite 1204
New York, NY 10006
(212) 385-4410
jkorek@lawyertime.com

*Attorneys for Plaintiff*